UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                                        )
         v.                             )         Case No. 1:15-cr-10076
                                        )
                                        )         Honorable Allison D. Burroughs
PATRICK W. FABIAN                       )
                                        )
_____)

**DEFENDANT PATRICK W. FABIAN'S**
**<u>SENTENCING MEMORANDUM</u>**

Frank A. Libby, Jr.
Brian J. Sullivan
Libby Hoopes Brooks, P.C.
399 Boylston Street, Suite 600
Boston, MA 02116
617-338-9300
falibby@lhblaw.com
bsullivan@lhblaw.com

*Counsel for Defendant Patrick W. Fabian*

January 6, 2021

## **TABLE OF CONTENTS**

**Pages**

I.      PRELIMINARY STATEMENT…………………………………………..      1

II.     THE GOVERNING LEGAL STANDARD……………………………….      7

III.    APPLICATION OF THE STATUTORY (3553(A)) SENTENCING
        FACTORS TO THE FACTS AND CIRCUMSTANCES OF THIS
        CASE SUPPORTS A CONCLUSION OF NO FURTHER
        PUNISHMENT…………………………………………………………...      9

        A.      History and Characteristics of the Defendant…………………….      9

                1.      Patrick's Character as an Engaged and Loving Son,
                        Sibling, Husband, and Father……………………………....      9

                2.      Patrick's Character as a Man of Demonstrated Integrity,
                        with Life-Long Respect for Self-Improvement through
                        Hard Work and Self-Discipline…………………………….      12

                3.      Patrick's Character as a Caring, Loyal, and Generous
                        Friend and Supportive Colleague …………………………      15

                4.      Patrick's Care for Others Shown by His Good Works and
                        Generosity to Those in Need………………………………..      16

        B.      "Seriousness" of "the Offense"……………………………………..      18

        C.      Sentencing Guidelines Ranges and Sentences Available………….      22

        D.      Policy Statements from the U.S. Sentencing Commission………..      22

        E.      Restitution……………………………………………………………      22

Pages

IV.   THE COURT SHOULD REJECT—AS A MATTER OF LAW—ANY
      ARGUMENT SEEKING TO ADJUST PATRICK'S BASE OFFENSE
      LEVEL PREDICATED ON "LEADER/ORGANIZER" (3B1.1)
      BECAUSE (1) 3B1.1 LEADERSHIP ROLE LOGICALLY
      PRESUPPOSES UNDERLYING "CRIMINAL ACTIVITY"
      COMBINED WITH A DEFENDANT'S "CRIMINAL INTENT;" (2)
      PATRICK'S "STRICT LIABILITY" MISDEMEANOR
      CONVICTION CARRIED WITH IT NO REQUISITE ELEMENT OF
      CRIMINAL INTENT; AND (3) THE *ACTUS REUS* OF THE
      (MISDEMEANOR) MISBRANDING AND ADULTERATION
      COUNTS FOR WHICH PATRICK STANDS CONVICTED, WAS
      "FAILURE TO SUBMIT A PREMARKET NOTIFICATION FOR A
      NEW INTENDED USE,"  AS TO WHICH PATRICK HAD NO
      INVOLVEMENT……………………………………………………   23

      A.   The "Role" Adjustment Set Out in Section 3B1.1, Presupposes
           *Mens Rea* on the Part of the Defendant and at Least *Some* of the
           "Participants;" Neither is Available Here…………………………   23

      B.   Because the *Actus Reus* of the (Misdemeanor) Misbranding and
           Adulteration Counts for which Patrick Stands Convicted, was
           "Failure to Submit a Premarket Notification for a New Intended
           Use," No "Role in the Offense" Adjustment May Be Applied to
           Patrick's Guideline Range, as a Matter of Law…………………...   26

      C.   Application of a "Role in the Offense" Adjustment to Patrick
           Would—On Top of His RCO Conviction (and Corresponding
           BOL)—Constitute Impermissible "Double Punishment"………..   27

V.    THE COURT SHOULD REJECT, AS A MATTER OF LAW, ANY
      ARGUMENT SEEKING TO ADJUST PATRICK'S BASE OFFENSE
      LEVEL PREDICATED ON "ABUSE OF POSITION OF TRUST"
      (3B1.3) BECAUSE (1) PATRICK'S OFFENSE OF CONVICTION
      WAS A "NO CRIMINAL INTENT" MISDEMEANOR WHICH
      FAILS TO SUPPORT ANY ADJUSTMENT REQUIRING
      "CRIMINAL INTENT;" AND (2) ANY SUCH ADJUSTMENT
      TURNS UPON CUMULATIVE FINDINGS, UNSUPPORTED IN
      THIS CASE, OF (A) DEFENDANT'S EXPLOITATION OF A
      "POSITION THAT PROVIDED FREEDOM TO COMMIT A
      DIFFICULT TO DETECT WRONG;" AND (B) THAT SUCH
      POSITION "SIGNIFICANTLY FACILITATED THE COMMISSION
      OR CONCEALMENT OF THE OFFENSE"……………………………   27

Pages

**A.** **Application of an "Abuse of Position of Trust" Adjustment to Patrick Would—On Top of His RCO Conviction (and Corresponding BOL)—Constitute Impermissible "Double Punishment"**……………………………………………………… 28

**B.** **Patrick's Offense of Conviction Was a "No Criminal Intent" Misdemeanor which Fails to Support any Adjustment, such as "Abuse of Position of Trust," in Turn Requiring "Criminal Intent"**……………………………………………………… 29

**C.** **Patrick's Position of VP-Sales Could Not and Did Not (1) Constitute Any "Freedom to Commit a Difficult to Detect Wrong;" or (2) "Significantly Facilitate the Commission or Concealment" of the Offense of Conviction** ……………………... 30

**VI.** **CONCLUSION AND RECOMMENDATION**…………………………... 30

## **<u>TABLE OF AUTHORITIES</u>**

### **Cases**

| Case | Pages |
|---|---|
| *Beckles v. United States*, 137 S.Ct. 886 (2017)……………………………………… | 8 |
| *Gall v. United States*, 552 U.S. 38 (2007)……………………………………………. | 7, 8 |
| *Koon v. United States*, 518 U.S. 81 (1996)………………………………………... | 7 |
| *Pepper v. United States*, 562 U.S. 476 (2011)…………………………………….. | 7, 9 |
| *Shea v. United States*, 976 F.3d 63 (1st Cir. 2020)………………………………... | 8 |
| *United States v. Agyekum*, 846 F.3d 744 (4th Cir. 2017)……………………….… | 28 |
| *United States v. Booker*, 543 U.S. 220 (2005)…………………………………….. | 7 |
| *United States v. Bracciale*, 374 F.3d 998 (5th Cir. 2004)…………………………. | 29 |
| *United States v. Brack*, 651 F.3d 388 (4th Cir. 2011)……………………………... | 28 |
| *United States v. Carrero-Hernández*, 643 F.3d 344 (1st Cir. 2011)……………… | 24 |
| *United States v. Deitz*, 950 F.2d 50 (1st Cir. 1991)……………………………….. | 25 |
| *United States v. Flecha-Maldonado*, 373 F.3d 170 (1st Cir. 2004)………………. | 30 |
| *United States v. Fuller*, 897 F.2d 1217 (1st Cir. 1990)……………………………. | 24 |
| *United States v. Ghertler*, 605 F.3d 1256 (11th Cir. 2010)………………………... | 29 n.10 |
| *United States v. Gill*, 99 F.3d 484 (1st Cir. 1996)…………………………………. | 28 |
| *United States v. Glinsey*, 209 F.3d 386 (5th Cir.2000)……………………………. | 24 n.7 |
| *United States v. Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002)………………….. | 29 |
| *United States v. Helbling*, 209 F.3rd 226 (3d Cir. 2000)………………………….. | 25, 26 |
| *United States v. Ilarraza*, 963 F.3d 1 (1st Cir. 2020)……………………………… | 7, 8 |

| Case | Pages |
|---|---|
| *United States v. Jones*, 523 F.3d 31 (1st Cir. 2008)………………………….. | 24 |
| *United States v. Laboy*, 351 F.3d 578 (1st Cir. 2003)……………………….. | 25 |
| *United States v. Lucena-Rivera*, 750 F.3d 43 (1st Cir. 2014)…………………….. | 24 |
| *United States v. Lula*, 267 Fed. App'x 462, No. 07-1929, 2008 WL 116350 (7th Cir. Jan. 9, 2008)………………………………………….. | 8 |
| *United States v. McCoy*, 242 F.3d 399 (D.C. Cir. 2001)………………………….. | 24 |
| *United States v. Narvaez-Soto*, 773 F.3d 282 (1st Cir. 2014)…………………….. | 8 |
| *United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012)………………………........ | 29 |
| *United States v. Richardson*, 221 Fed. App'x 782, No. 06-6125, 2007 WL 1054702 (10th Cir. Apr. 10, 2007)…………………………………………… | 24 n.7 |
| *United States v. Rivera-Gonzalez*, 776 F.3d 45 (1st Cir. 2015)………………….. | 9 |
| *United States v. Sicher*, 576 F.3d 64 (1st Cir. 2009)………………………………. | 28 |
| *United States v. Stella*, 591 F.3d 23 (1st Cir. 2009)………………………………. | 29 |
| *United States v. Thung Van Huynh*, 884 F.3d 160 (3d Cir. 2018)……………….. | 25 |
| *United States v. Vega*, 826 F.3d 514 (D.C. Cir. 2016)…………………………….. | 24 |

## Statutes, Rules and Regulations

| | Pages |
|---|---|
| 18 U.S.C. § 3553…………………………………………………………………….. | 7, 8, 9, 30 |
| 28 U.S.C. § 994…………………………………………………………………….. | 7 |
| U.S.S.G. § 3B1.1…………………………………………………………………….. | *passim* |
| U.S.S.G. § 3B1.3…………………………………………………………………….. | *passim* |

Defendant, Patrick Fabian, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence.

## I.  PRELIMINARY STATEMENT

Patrick Fabian's personal and professional life has been one distinguished by an abiding commitment—to family, friends, classmates, teammates, business colleagues, those in need—and dedication to personal integrity.  Patrick, now turning 54, grew up a "hockey kid," one of two sons, in a caring, loving Minnesota household, introduced to ice skating when he was two. Patrick flourished both athletically and academically, at his military high school (St. Thomas Academy, St. Paul) and—excelling on the ice—made the cut to then play "Junior A" hockey (a highly regarded professional development program), for two years.  Patrick moved on to college at University of St. Thomas (St. Paul), to study business administration, where he met his best friend and now wife, Gina.  Married nearly thirty years now, Patrick and Gina have been blessed with three daughters—Taylor (29 years old); Sydney (26); and Kennedy (25)—each of whom, like their father, grew to love competitive sports and the outdoors (after years of enjoying his own opportunities of athletic competition, teamwork and success, Patrick coached many of his daughters' sports teams).

Patrick and Gina made sure that all three daughters grew up in a home consistently demonstrating and teaching the importance of: care and compassion for others; integrity and personal trustworthiness; a solid work ethic and commitment to self-improvement; and to not forgetting, but to lending a hand, to others in need.

All three daughters went on to college studies and college athletics; all three applied themselves academically, as they had at home, earned their respective diplomas (as Patrick and Gina had envisioned) and now enjoy being on their own, working at their respective jobs.

Patrick has made the medical device field his life's work.  While seeing the opportunity to work hard and provide for his growing family, Patrick, more importantly, saw the many benefits that innovations in the medical device industry would have on the patients whose lives would be improved significantly by his efforts and the efforts of his colleagues.  For example, Patrick has worked with companies providing:

- advanced hearing solutions, to provide otologists, ENT ("ears, nose, and throat") doctors, and audiologists with devices that help their patients to hear again;

- noninvasive (water vapor based) therapy to shrink and remove excess prostate tissue pressing on the urethra, allowing (primarily older) men to resume a normal life; and

- treatment for carpal tunnel syndrome in a micro-invasive fashion, providing relief that would otherwise historically been available only through general surgery.

(**PSR ¶¶ 117–119**).

Patrick joined Acclarent as its Vice President of Sales, in August 2007—approximately one year after the company filed its 510-K for Stratus.  Patrick was excited to come on board with Acclarent at a time when the company's core business remained in balloon therapy and Stratus presented a major step forward in providing minimally invasive care for those suffering from chronic rhinosinusitis ("CRS").  Particularly, Stratus provided an alternative to altering a patient's anatomy, avoided taking tissue and mucosa, and provided an opportunity for natural healing.  In short, Acclarent and Stratus presented an opportunity for a CRS patient to avoid life as a sinus cripple.

Patrick was highly impressed with Acclarent, its organizational configuration, and its people.  Patrick could tell, before coming on board, that Acclarent was staffed with full-time professionals heading up important job functions, such as CEO, quality control, research and

development, regulatory/clinical, and marketing.  Patrick's good faith belief in his company and his colleagues, was underscored by the routine input and training his salespeople received from in-house legal and regulatory/compliance, which included detailed "off label" training given by the company's chief regulatory officer (Deb Cogan), "MKT"–numbered training manuals, and the company's "pre-call" plans that had to be approved by the regulatory department.  Patrick was excited to learn from messages and reports from the field, that physicians were having great success with Stratus, delivering relief and benefits in turn to their patients.  Patrick learned that the majority of Stratus orders (nearly 80%), were re-orders from those physicians using Stratus for the benefit of patients, out in the field.  Throughout his time at Acclarent, Patrick, and his salespeople, had every good faith reason to believe that they were doing their jobs, doing good things, helping surgeons in turn provide significant relief to their chronic rhinosinusitis patients.

Then, seemingly out of nowhere, Patrick received word that his company—and he—were under federal criminal investigation; that he should engage a lawyer.  Prior to that time, there had been no indication that any governmental agency believed Acclarent, or anyone at Acclarent, had been involved in any kind of wrongdoing, much less criminal activity.  To the contrary, Patrick and his colleagues fully believed that their ENT physician customers thought highly of the Stratus device and had come to rely upon it; they knew that many of these physicians' sinus patients had been helped by the medical practitioners' decision to avoid invasive, irreversible surgery, and with the benefit of Stratus, had saved the patient from what would otherwise been a life <u>without</u> normal sinus mucosa and cilia function; and they knew that there had been few adverse events and no serious harm.

The government, spurred on by a particularly vengeful whistleblower (who hosted a website devoted to attacking Acclarent, her former employer, and Facteau and Fabian, by name),

had chosen not to pursue administrative or civil means to address its concerns.  Rather, the government resorted to the grand jury and elected to evaluate its investigation through the lens of an antiquated regulatory framework, one hobbled by a decades-long concept of "intended use" that had beaten back decades of combined governmental and private sector efforts to settle upon an intelligible, working definition.

In April 2015, the government secured an Indictment, charging, *inter alia*, (felony) wire fraud, securities fraud, conspiracy to defraud doctors, FDA and others, and felony distribution of misbranded and adulterated devices "with intent to defraud or mislead."  Tucked into the **Indictment (Dkt. No. 1 ¶¶ 113-114)**, amongst the many felony charges, however, was language characterizing both Fabian and co-defendant Facteau, as "responsible corporate persons," "with respect to the Stratus."

On the morning of April 9, 2015, Patrick's counsel—aware of the indictment returned the day before and having that day been visited by his client, who had interrupted his ongoing, scheduled business travel to come to counsel's office—telephoned the U.S. Attorney's office to arrange Patrick's self-surrender to the U.S. Marshals.  Pulling up to the U.S. Courthouse with his lawyer approximately 20 minutes later as agreed, however, four or five federal agents approached Patrick's (courthouse) side of the cab, one or two of the agents said nothing (to either Patrick or his lawyer) but reached in and pulled him out of the vehicle, wheeling him across the path of several passersby and to the far side of the sidewalk.  While one of the agents was cuffing Patrick, another agent immediately began questioning him.[1]

Some 15 months later, and after a nearly two-months long trial, the jury returned a verdict utterly rejecting the government's core case of fraud and conspiracy to defraud and

---

[1] That questioning stopped only at the insistence of Patrick's lawyer.

mislead the FDA and ENT physicians, and charges of acting with criminal intent.  Rather, the jury found Fabian and Facteau strictly liable for misdemeanor misbranding and adulteration (on "failure to file for PMA" regulatory grounds) on the above-mentioned "responsible corporate officer" theory.

The Government's **Press Release** ("Wednesday, July 20")[2] stated, as required, that the jury had "acquitted Facteau and Fabian on 14 felony counts of fraud," but went on to read as if the government had actually won a victory.  The casual (non-white collar lawyer) reader could be forgiven for coming to that conclusion as the government's statement made <u>no</u> mention that the convictions for (as it put it) "crimes <u>related</u> to the sale of medical devices" required no finding of criminal intent, nor did it mention that the defendants' respective misdemeanor liability had only to do with a regulatory ("failure to file") violation derived almost entirely from their respective positions within the company.  The <u>jury's</u> complete rejection of the government's "fraud" theory notwithstanding, the government also thought it necessary and appropriate that the Press Release go on to describe for the public what the <u>government</u> believed "the evidence at trial demonstrated."

Now, after years of putting Patrick's freedom in jeopardy, after having taken its best (felony fraud) shot at Patrick but having those charges turned away by a jury, the government again effectively ignores the jury's decision, doubles down and seeks effectively, to put Patrick in jail.

---

[2] True copy of press release attached. **Declaration of Brian Sullivan in Support of Sentencing Memorandum, Exhibit A** (hereinafter, "Sullivan Decl. Ex. A").

For 18 U.S.C. § 331(a) offenses—adulteration and misbranding misdemeanors—like the present case, Probation applies U.S.S.G. § 2N2.1, and a corresponding base offense level ("BOL") of 6. (**PSR ¶ 81**).  Patrick does not dispute a Level 6 BOL.

Patrick <u>does</u>, however, dispute application of any adjustments to the BOL, for either "role in the offense" under U.S.S.G. § 3B1.1[3] or "abuse of position of trust" under U.S.S.G. § 3B1.3.[4]

Having (1) spent the last five-plus years (pre-and post-trial) with his liberty interests in jeopardy and living and working under substantial conditions of release, including (a) restrictions upon (essential business) travel (eased, somewhat, following trial, but with continued referral to "secondary examination" upon Patrick's arrival at foreign airports); (b) home visits and monitoring; (c) periodic reporting; and (d) continuous supervision by a string of Probation Officers from the District of Minnesota; (2) borne the brunt of repeated electronic and print media assaults upon his name and his hard-earned reputation for integrity and ethical dealing; and thus (3) become the object of gossip and shaming, amongst those who do not know him well enough to immediately dismiss the negative press and inevitable talk, Patrick has already paid dearly as a result of this prosecution, and now, patently confusing ("what do you mean, 'no criminal intent?'") verdict. **Personal Statement of Patrick W. Fabian, Sullivan Decl. Ex. I.**

Under the laws and regulations governing sentencing in this case, which involves (1) the government's decision to pursue a strict liability theory, where "good faith" is simply no defense; and (2) the good faith interpretation of a long-complained of, but persistently confusing regulatory framework (neither DOJ nor FDA, the agency sponsoring this investigation and

---

[3] Probation suggests a 'leadership role" in the offense, and suggests a two-point adjustment, under § 3B1.1(c).  **PSR ¶ 84**.  The Government takes the position (in its Objections to the PSR) that Patrick's "role in the offense" supports a four-point adjustment).

[4] Probation likewise rejects any such adjustment, as it includes none in the PSR.  The government—again by way of its Objections to the PSR—seeks a two-point "abuse of position of trust" adjustment.

prosecution, has an internally consistent definition of "intended use"), and respectfully calling for the Court's exercise of discretion and corresponding "individualized judgment," no further punishment is warranted.  Stated otherwise, taking all of the foregoing into account, together with the requisite consideration of the sentencing factors set out in Section 3553(a) and demonstrated immediately below, leads to the conclusion that "sufficient, but not greater than necessary" punishment for Patrick in this extraordinary case has already been meted out.

## II.     THE GOVERNING LEGAL STANDARD

Title 28 U.S.C. § 994(j) concerns the United States Sentencing Commission and states that, "[t]he Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  Consistent with § 994(j), the goal of sentencing is to impose punishment "<u>sufficient, but not greater than necessary,</u>" a term widely known as "the parsimony principle."  18 U.S.C. § 3553(a) (emphasis supplied).  Judges, in making sentencing decisions, should approach "'every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'"  *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

The U.S. Sentencing Guidelines were designed to aid uniformity in sentencing.  But as the Supreme Court has made clear, true uniformity "depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."  *United States v. Booker*, 543 U.S. 220, 250 (2005) (emphasis omitted).  As such, the Guidelines are merely advisory, and judges "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 39 (2007).  In other words, the Guidelines are a "starting point for fashioning a sentence," but nothing more.  *United States v. Ilarraza*, 963 F.3d

1, 5 (1st Cir. 2020) (citing *Gall*, 552 U.S. at 49); *see also, United States v. Lula*, 267 Fed. App'x 462, No. 07-1929, 2008 WL 116350 at 463 (7th Cir. Jan. 9, 2008) ("At sentencing, there is no thumb on the scale in favor of a guidelines sentence.") (internal quotation marks omitted).

A sentencing judge "must make an individualized assessment" of each case. *Shea v. United States*, 976 F.3d 63, 67 (1st Cir. 2020) (quoting *Beckles v. United States*, 137 S. Ct. 886, 894 (2017)); *United States v. Narvaez-Soto*, 773 F.3d 282, 288 (1st Cir. 2014) ("a sentencing court is not to presume that the GSR invariably sets the parameters of a reasonable sentence but must 'make an individualized assessment based on the facts presented'") (quoting *Gall*, 552 U.S. at 50). In making that assessment, judges consider the seven factors set forth in Section 3553(a). These factors include:

(1)     the individual facts of the offense and the characteristics of the defendant;

(2)     providing just punishment that reflects the seriousness of the offense, promotes respect of the law, deters future crimes, protects the public, and provides the defendant with necessary services;

(3)     the sentences available;

(4)     the sentences and sentence ranges suggested by the Sentencing Guidelines;

(5)     policy statements from the Sentencing Commission;

(6)     avoiding unwarranted sentencing disparities; and

(7)     restitution to the victims.

18 U.S.C. § 3553(a). Given the regulatory offenses for which Patrick stands convicted—misbranding and adulteration misdemeanors, returned solely on a "Responsible Corporate Officer" (strict liability) theory of liability—and a Guidelines-driven sentencing construct designed largely to determine punishment for *intentional* criminal activity, some of the foregoing factors are of little or no application, and thus of little help to the sentencing court. Nonetheless,

where applicable at all, judges should weigh these factors within the bounds of reason—and

"that type of balancing is, within wide limits, a matter for the sentencing court." *United States v.*

*Rivera-Gonzalez*, 776 F.3d 45, 50 (1st Cir. 2015). After considering these factors, it is up to the

court to use its "wide discretion" to issue a sentence that "fit[s] the *offender* and not merely the

crime." *Pepper*, 562 U.S. at 480, 487–88 (emphasis added) (internal citation and quotation

marks omitted).

## III.   APPLICATION OF THE STATUTORY (3553(A)) SENTENCING FACTORS TO THE FACTS AND CIRCUMSTANCES OF THIS CASE SUPPORTS A CONCLUSION OF NO FURTHER PUNISHMENT

### A.   History and Characteristics of the Defendant

#### 1.   Patrick's Character as an Engaged and Loving Son, Sibling, Husband, and Father

The letters submitted to the Court by those who know Patrick best, and longest—

members of his immediate family and business associates of significant longstanding—paint a

clear and compelling picture of a son, husband, and father devoted to the care and well-being of

his family:

*Letter of Gina Fabian, college sweetheart and wife:*

> When I met Patrick back in college, we worked together at a local bar/restaurant.
> … [W]hen we worked late, [he] always walked me to my door to make sure I got
> in safe. … Pat has always treated me with the utmost respect and helped me to
> become the confident, self-assured person I am today. He has also become the
> father to our daughters that I had longed for throughout my life.
>
> …
>
> Pat is a loving father, but he expects a lot from each of [his daughters]. He holds
> them to the same standards he holds himself to. If you asked them, his standards
> are simple; be honest, be loyal, earn respect, work hard, and integrity is an
> absolute with him…. Being a parent is hard work, but I am proud to say we have
> raised three daughters who are good people with integrity.

**Sullivan Decl. Ex. B at 1-2**.

*Letter of Joan Fabian, Patrick's mother and former Commissioner of Corrections for the State of Minnesota, overseeing all State Prisons and State Probation and Parole services (8 years), and (successively) Probation Officer; Probation and Parole Supervisor; and Director (37 years, the final 14 years of which, Director) for the Ramsey County (St. Paul, MN) Community Corrections Department):*

> My husband and I have always been proud of Patrick. As a young child and during adolescence he was (usually) a joy to have around.
>
> …
>
> Faith and family was a major focus of our parenting.
>
> …
>
> He was never a problem kid (or adult). … [H]e was forthright, smart, outgoing, conscientious, and funny. He held himself (and others) to high moral standards and took his role as big brother (his brother Sean, is two years younger) very seriously. He always treated us with respect and love.
>
> …
>
> We watched Patrick grow increasingly confident, self-motivated and concerned about others.  For example, while in college, his hectic schedule of study, class work, hockey practice and travel to games, left him very little free time.  But he made time to regularly visit his elderly grandparents and to play Scrabble with them. They loved his visits!
>
> …
>
> Patrick made the best decision of his life, when he married his wife, Gina. They have a strong loving union. He is blessed to have the support of a woman with great wisdom, grace and strong moral character. They are excellent parents to their three daughters. The girls are genuinely good kids and definitely a source of family pride. They are well adjusted, happy, caring and hardworking like their parents. All three were excellent student athletes in college and have all graduated. They are now pursuing their respective careers and have become productive, involved citizens.

**Sullivan Decl. Ex. C at 1-2**.

*Letter of Sydney Fabian, daughter (age 26):*

> I am the middle child of three daughters, my older sister Taylor is a successful business woman at Enterprise Fleet Management, and my younger sister Kennedy is the Assistant Woman's Volleyball Coach for Division II Minnesota State

Mankato. I currently work for my father's company as a Professional Education and Training Representative at a start-up medical device company called Sonex Health. All three of us were college athletes, graduated with degrees, and now have been successful in our young careers, large in part to the values our dad has instilled in us.

My parents created a wonderful childhood for me and my sisters. We spent a lot of time together, and we especially loved (and still love) watching and playing sports as a group. From a young age my parents encouraged us to join team sports due to the lessons that can be learned from them. Some of these lessons being hard work, team work, and dedication. Dad never missed an opportunity to talk to us about the value of working hard and where that could get us. My dad leads by example with this lesson. During my childhood he travelled quite a bit for his job, whenever there was an opportunity to grow his business or help out his team, he would jump at it. Although my dad was extremely dedicated to his work, he never let that impede on the time he spent with me and my sisters. He worked just as hard at being a dad as he did at being a businessman. He came to hundreds of dance recitals, Christmas concerts, painful youth hockey practices, and he and mom even travelled all over the country to watch me play softball in college—all in support of me and my sisters and what we showed interest in. My dad was always the first one there after every single game or activity—telling me first, that he was proud of me, and then, more meaningfully, giving me advice and feedback on how I could grow and get better. My parents created an environment that allowed us to make mistakes, but learn from those mistakes, and become better people.

**Sullivan Decl. Ex. D at 1**.

*Letter of Krisi Bailey, friend since college:*

Pat is a very proud Dad and together with Gina has raised three wonderful girls. He has worked hard through the years to be able to provide opportunities for the girls to pursue their interests. He spent time coaching the girls in various activities throughout their youth. And although he traveled for work frequently, he made it a priority to be there to watch and [ ] support the girls at all their various sports through high school and college including volleyball, hockey and softball. Pat has also been very supportive as the girls, now young women, have pursued their careers following college.

**Sullivan Decl. Ex. E at 1**.

*Letter of Robert Paulson, long-time medical device industry colleague of Patrick's:*

I have had the opportunity to be part of the medical device industry for more than twenty-five years, the past fifteen of which I served as the President and CEO of three different venture capital funded medical device companies. During my ten-year tenure as President and CEO of NxThera, Inc. [manufacturer of innovative

non-invasive urology device], I had the opportunity to hire Patrick Fabian as our Chief Commercial Officer until the company was acquired by Boston Scientific Corporation in 2018. Patrick reported directly to me, and I worked closely with him as a member of our leadership team during the period 2014 to 2018.

…

Patrick Fabian is a devoted, loving and committed husband, father, son, and brother. As the father of three young women, Patrick and his wife Gina not only raised their daughters with love and compassion, but also with the expectations that each would be loving, independent, self-confident women, committed to their family and to their education and professions.

**Sullivan Decl. Ex. F at 1**.

> **2.    Patrick's Character as a Man of Demonstrated Integrity, with Life-Long Respect for Self-Improvement through Hard Work and Self-Discipline**

A theme running consistently through the letters in support of Patrick, is one of a strong

work ethic, guided by principles of integrity, personal accountability and moral leadership:

*Letter of Roy O'Hanley, medical device development colleague of Patrick's and family friend of 25 years:*

I have worked with Patrick Fabian in 4 different medical device companies dating back to 1996.

…

[G]oing to work for Pat became a very pivotal moment in my life. Very quickly I learned a few things that he held in firm belief:

1 - Working hard is the price of admission, it does not give you the right to expect success

2 – There is a right way (and any many wrong ways) to do everything, figure out the right way to do it and then have the discipline to do it that way consistently

3 – Integrity is everything, your most important asset is your word

Pat spent an enormous amount of time showing me the right way to do things.… I can't remember him ever saying no when I or someone on our team asked for his help or his time. Over the next few years, I came to understand that developing people and seeing them become successful was what Pat derived his motivation and sense of self-satisfaction from.

…

[W]ork hard, and integrity and discipline were core values [Patrick] and Gina taught their kids.

**Sullivan Decl. Ex. G at 1**.

*Letter of Robert Paulson, NxThera President and CEO (and Patrick's Direct Report):*

[A]s the commercial leader of NxThera's sales and marketing teams, and a member of our leadership team, … Patrick was exacting in the standards he established, holding himself and each member of his team, as well as his peers on the leadership team, accountable to meet and exceed performance expectations. Patrick was unwavering in his commitment to ensure he and each member of his team acted with integrity and honesty and their interactions with physicians and their staff.

…

I had complete trust and faith, based on personal observations and experience, that Patrick was leading with honesty, integrity, and an unwavering commitment to the high personal and professional standards each member of our leadership team required of each other, and our colleagues throughout the company.

Patrick Fabian is a caring and compassionate man of faith, a loving and supportive husband and father, and a gifted leader of people in the medical industry.

**Sullivan Decl. Ex. F at 1-2**.

*Letter of Krisi Bailey, close friend since college:*

Pat and I became friends early in our college career as we had several classes together and he played on the hockey team and I was a cheerleader for the team. . . .Pat and Gina lived away from Minnesota for several years and I am happy to say that we continued to remain friends through all the years as their family has now grown to include three kind, smart and strong daughters. In addition to being a friend of Pat's, I have also had the opportunity to work with him on several occasions at different organizations.

…

He has a strong work ethic and he focuses on building teams that both excel at what they do and also enjoy their work. Pat has always been highly accountable, fair in his decision making and honest in his approach. Through the years I have seen him continue to evolve as a leader and continue to develop his skills to focus

on building and mentoring his team. He is a continuous learner which helps him be able to better serve his teams.

**Sullivan Decl. Ex. E at 1-2**.

*Letter of Joan Fabian, Patrick's mother:*

> For the past 30 years Patrick has worked incredibly hard to earn the reputation of being honest, trustworthy and true to his word in both his personal and professional dealings. He chose the area of medical device development and distribution--not only to support his family, but to make a difference in people's lives. He has always understood that his success is based on having a solid reputation, integrity, hard work and a genuine concern for patients.

**Sullivan Decl. Ex. C at 2**.

*Letter of Sydney Fabian, daughter (age 26):*

> Much like his colleagues, my father has extremely high expectations and standards for my sisters and me. When we are not meeting those expectations or moral standards, he is going to let us know. When I was in 8th grade I found myself in quite a bit of trouble. I never seemed to do what is told and I got into the bad habit of telling lies about, well, pretty much everything. I spent a lot of time grounded in my room, but this did not seem to stop me from making poor decisions.  After school one day, my dad sat me down at the kitchen counter and asked me one simple question, "What does the word integrity mean to you?" I had no answer for him. He told me that he wanted me to look up the meaning of integrity, and write a three-page paper on what integrity means to me, how I have demonstrated integrity and how I have not demonstrated integrity. When I finished my paper, my dad and I had a two-hour conversation about what I wrote, and also about what integrity meant to him. At the end of our conversation, we both signed and dated my paper as a form of a contract agreement. I was signing to agree to live my life with integrity, and he was signing to hold me accountable in that agreement.  What I learned from that experience with my dad that day is a lesson I will carry with me always, without integrity you are unable to build meaningful relationships, you are unable to be a leader, and you are unable to grow as a person in any capacity. People who lack integrity are not people you want in your corner.

**Sullivan Decl. Ex. D at 2**.

### 3.   Patrick's Character as a Caring, Loyal, and Generous Friend and Supportive Colleague

Another trait commented upon frequently by those who have grown up with him, or worked with him, are his generosity of spirit, and care for his colleagues, shown through his commitment to developing his teammates and teaching by example:

*Letter of Gina Fabian, college sweetheart and wife:*

> Patrick takes pride in having a few very good friends. He has always told his daughters to be the kind of friend someone would want in their foxhole and to find the friends that you would want in yours.… If you ask any of Pat's friends, they will tell you, he would be the first one they would call if they needed anything. Pat has modeled what it means to be a great friend. He is the most loyal friend I have ever had.
>
> …
>
> When he was promoted to a management role, he traveled a lot working with his sales reps, week after week, showing he was willing to work hard and help them succeed. Pat has gone to other companies throughout his career and many of these people that he mentored over the years have followed him from company to company.

**Sullivan Decl. Ex. B at 2-3**.

*Letter of Roy O'Hanley, medical device development colleague of Patrick's and family friend of 25 years:*

> The first thing [Patrick] said when I was officially promoted [to my first leadership opportunity] was "Your number one job is to develop your people."
>
> We went our separate ways to pursue our careers a few times since that time but I ended up going to work for him again in 2010, 2015 and 2019 in 3 additional organizations. I am not unique in this regard as many people have followed him to multiple companies. The people that tend to gravitate toward Pat are people who want to be the best they can be. They appreciate his commitment to their success and trust that he has their best interest in mind.

**Sullivan Decl. Ex. G at 1-2**.

*Letter of Krisi Bailey, friend since college:*

> In addition to being a friend of Pat's, I have also had the opportunity to work with him on several occasions at different organizations.

15

Pat is a very loyal friend and if there is ever a situation where you need help with something, he is always there willing to provide help. Pat has offered support to me through the years both personally and professionally. He has always encouraged me during challenging times and been there to help celebrate the big events through life.

**Sullivan Decl. Ex. E at 1**.

*Letter of Sydney Fabian, daughter (age 26):*

The time, effort, and dedication my dad put into teaching me how to play hockey, is the exact same time, effort, and dedication that he puts into everything he does. He has found great success in many of the companies he has worked for, and not by mistake. I currently work for my dad and I have had the opportunity to see first-hand the level of respect his colleagues have for him. My dad puts every ounce of himself into his work—learning the ins and outs of the devices he is selling—which consists of hours of research and hands on training. He then uses the knowledge he gains to create a bulletproof training program for his team to participate in which builds a foundation of knowledge and establishes a team culture that breeds success while selling in the field. If one of his colleagues requests additional training, my dad is the first one to offer assistance. Whether that be over the phone role-playing sales situations, or flying out to where a specific rep is to assist them with cold calls, he will do whatever it takes to support the people around him so that they can be successful. My dad has extremely high expectations for his colleagues, but I can say with confidence that he has never asked of anyone what he does not demonstrate in his own life on a regular basis. Whether he is leading a sales team, coaching a 12u girls hockey team, or helping me and my sisters with a homework assignment, his standards remain the exact same and his effort in creating an environment for growth and success is unwavering.

**Sullivan Decl. Ex. D at 2**.

4. **Patrick's Care for Others Shown by His Good Works and Generosity to Those in Need**

Patrick has also contributed a significant amount of time and money to various charitable organizations in his community.  Such contributions include being a foundational contributor and serving as a board member for a period of time to a non-profit ("BonafideU") that provided scholarships for students based on acts of kindness; donating money for scholarships to private high schools for underprivileged children that would not otherwise be able to afford to attend;

donating money to various children's hospitals and veteran's groups; and volunteering as a

hockey coach for 20 years in addition to coaching and helping out with his daughters' teams.

*Letter of Gina Fabian, college sweetheart and wife:*

> When [Patrick's grandfather] Fred was young, he always wanted to go to St. Thomas Academy ["STA"], which was a private high school military academy that shared a campus with the university.   It was so important for Fred to graduate from St. Thomas Academy that he worked many jobs over the years to pay for himself to attend his senior year. He was always proud to tell people he graduated from STA.   Fred then sent his two sons to the academy.   Pat was the third generation of Fabian's that graduated from STA.   He was always aware of the sacrifice that his grandfather made to start that tradition and valued the experience so much that he donates to a scholarship fund for others who want to attend STA but who otherwise could not.   We also donate to the high school our daughters attended for that very same purpose.
>
> …
>
> We donate to St. Jude's, and Children's hospitals in our community. Our sister-in-law, Sara works for Children's Hospital Charities, so we are able to be involved in many of the events that raise money for the hospitals.   Pat and I have close family that have served in the military, so we also donate to our local veteran's groups. Although we are not special because we give to charity or donate our time, but we do believe that showing our children that the world is bigger than themselves is what we hope to be our real contribution to the world.
>
> …
>
> Patrick has always traveled extensively during his career, but he still made time to volunteer as a hockey coach for more than 20 years at all levels from high school down to mites.   Pat also coached our daughter's hockey team for a few years which was his first experience coaching a girls' hockey program.   He always said it was one of his most enjoyable time[s] as a hockey coach.   Patrick also helped with softball, volleyball, soccer and golf for our other two daughters, assistant coaching, line judging, umpiring, among other things.   Pat always says he enjoyed seeing our daughters succeed and accomplish their goals more than he got satisfaction from all his own accomplishments put together.   I know a lot of parents volunteer their time and talents for their children but I think it really says a lot about a person when many of the kids who Pat coached, helped, and mentored, during those years reach out to him now for career advice.
>
> …

Pat and I were approached by some college friends with a non-profit company they were establishing called BonafideU/Civilities Cool, that focused on anti-bullying and promoting acts of kindness.  The platform was to encourage kids to write in about someone other than themselves who showed them kindness, support, friendship, or anything that impacted them in a positive way.  Pat and I along with our grown children, loved the idea so we donated $100,000 into the project.  Pat became a consultant and board member to help get the program off the ground and our youngest daughter, who was a senior in college, also helped with the social media platforms.  He was able to raise money for scholarships for the kids that were chosen from the letters written in on their behalf.  He got friends and leaders from the community to sponsor scholarships to encourage others to do the same.  Patrick has always been very generous with his time, talents and believes in giving back.

**Sullivan Decl. Ex. B at 1-3**; **Sullivan Decl. Ex. H (BonafideU Foundation Website)**.

**B.     "Seriousness" of "the Offense"**

Acclarent was an innovative company whose products helped to revolutionize the treatment of sinus conditions through the development of minimally invasive surgical devices. Acclarent's most successful products, and the company's primary revenue generators, were its balloon sinuplasty products ("BSP").  Balloon sinuplasty is a type of nasal endoscopic surgery that uses small inflatable balloon catheters to drain nasal sinuses.  Acclarent also developed a separate device called the Relieva Stratus Microflow Spacer ("Stratus").  During the years when it was sold, the Stratus generated only a small percentage of Acclarent's revenues.

Long before Stratus, ENT physicians used steroids, including Kenalog, to treat sinusitis and other sinus conditions.  Although treatment with steroids is common and often the standard of care, it is nonetheless off-label.  By the time Patrick joined Acclarent, FDA had not approved or cleared a single steroid or steroid delivery device for use in the sinuses, despite the widely recognized benefits of steroids in treating sinus conditions.  Those benefits include the reduction of inflammation, the treatment of polyps, a lessened risk of adhesions, and the facilitation of drainage.

From the perspective of physicians, however, one of the significant benefits of the Stratus was that it could be used to topically deliver a precise quantity of steroids directly to a targeted sinus.  In so doing, the device:

a. Eliminated the need for patients to take systemic steroids, thus avoiding the risks posed by such medication;

b. Ensured that steroids were applied directly where wanted and needed, unlike other topical forms of administration (like nasal sprays), where the steroids often do not make it all the way to the sinuses;

c. Permitted the injection of a precise and limited quantity of Kenalog, and the extended release of that steroid, unlike physician-improvised techniques, such as squirting steroids onto disposable gauze, sticking steroids into cut-off surgical glove tips, and physically wedging those objects into the sinus; and

d. Spared patients from painful and invasive ("roto-rooter") surgery and its adverse effects.

Doctors who used the Stratus with Kenalog were aware that they were using the device in an off-label manner.  Acclarent and its sales representatives never misled any doctor about the fact that injecting the Stratus with Kenalog represented an off-label use.[5]

---

[5] At trial, the government's own (sales representative) witnesses  uniformly testified that they: never lied to any doctors; were never instructed to lie to any doctors, and never believed for a moment, that they were breaking any law.  For example:

- Molly Vanderkarr testified that she would not and did not lie, deceive, knowingly withhold or conceal any information from a doctor to whom she was selling Stratus.  **Day 6 Trial Tr. at 226:19-228:2**.

- Kevin Convery testified that he did not lie to, deceive, cheat, or tell anything less than the whole truth to any doctors, and that he was proud of the work he did at Acclarent.  **Day 9 Trial Tr. at 218:15-220:3**.

- Barbara Logan testified that she would never lie to, cheat, or deceive any doctor; never gave a half truth or misleading answer to a doctor's question; and never created any misimpression with a doctor regarding Stratus.  **Day 10 Trial Tr. at 211:20-213:6.**

- Bradford Ader testified he never lied to doctors and he was never instructed by Mr. Fabian to lie to, deceive, or cheat any doctors.  **Day 11 Trial Tr. at 50:11-51:16.**

- Fed Barrigar testified that he did not believe, even for a moment, that he was doing anything illegal at Acclarent and he did not believe anyone else at Acclarent was breaking the law.  **Day 14 Trial Tr. at 146:11-147:10.**

- Eric Krinsky testified that he never lied to any doctors or withheld any information from doctors.  **Day 10 Trial Tr. at 49:22-50:1.**

More than 30,000 Stratus devices were sold.  Many were re-orders to doctors who found the Stratus to be a safe and effective treatment for their patients.  Statistically, the device had an extremely low rate of adverse effects.  It caused no serious patient injuries and no deaths. Acclarent sales representatives marketed and sold the Stratus using materials and procedures that had been reviewed and approved (marked and known as "MKT-" materials) by experienced employees in the company's Regulatory department.  The rules governing the sale of medical devices are complicated and confusing, particularly where, as here, considerable numbers of physicians elect to use a device off-label.

Patrick sought, in good faith, to ensure that Acclarent's sales personnel complied with those rules, and in good faith believed that Regulatory was reviewing and approving, in advance, all promotional materials and programs pertaining to the marketing and sale of the Stratus, to ensure compliance with all regulations and laws.  Patrick never thought for a moment, that he or the company was doing anything wrong.

The Government nonetheless indicted both Fabian and Facteau, charging them in multiple counts with having knowingly and intentionally engaged—and conspired to engage—in acts of fraud and deception, including but not limited to alleged involvement in the making of false and misleading statements to the FDA, physicians, and others regarding the Stratus; devising a fraudulent scheme to deprive others of money and property through use of interstate wire communications; and allegedly causing the introduction of adulterated and misbranded devices into interstate commerce with the intent to defraud or mislead.

---

- Norman Bilsbury testified that Mr. Fabian never instructed him to tell anybody that the Stratus was cleared for Kenalog, that he always told doctors what the FDA clearance for the Stratus was, that he never introduced Kenalog to any doctor and that if a doctor used Kenalog it would be based on his or her independent judgment.  **Day 11 Trial Tr. at 130:16-24, 135:20-25.**

After a 30-day trial, the jury returned its verdict, acquitting both Facteau and Fabian of all charges predicated on allegations of fraud, falsity, deception, or misrepresentation.  Specifically, the jury found both defendants not guilty of conspiracy, not guilty of wire fraud, and not guilty of causing the introduction of adulterated or misbranded devices into interstate commerce with the intent to defraud or mislead.

The sole counts of conviction were for misdemeanor violations of the Food, Drug and Cosmetic Act—namely, that Facteau and Fabian, in their respective capacities as corporate officials at Acclarent, *and without any intent to defraud or mislead* —were responsible for Acclarent's introduction of the Stratus into interstate commerce for an intended use not cleared or approved by the FDA.  More particularly in this respect, the jury found each Facteau and Fabian strictly liable for Acclarent's having "failed to file a new premarket notification to the FDA" for a different intended use.  (**Dkt. No. 436, Jury Instructions, at 36: "Misbranding by Failure to File Pre-Market Notification"**).

These misdemeanor counts—unlike the felony counts on which the jury acquitted Facteau and Fabian—required no finding by the jury that either defendant knowingly or actively engaged in any wrongdoing.  A good faith belief by Facteau and Fabian that they were following the law as they understood it was no defense.  Rather, the jury was instructed that to convict on the Indictment's misdemeanor charges, it need only determine that the defendant held a "position of responsibility" within Acclarent "with the authority to prevent or correct the charged adulteration and misbranding violations, and that the violations nonetheless occurred and were not corrected." (*See* **Dkt. No. 436 Jury Instructions, at 38; "Corporate Official's Liability for Violations of FDCA"**).

Importantly in this respect, and at all relevant times, Patrick served as Acclarent's Vice President-Sales. It was undisputed (and the government adduced no evidence at trial, to the contrary) that Patrick played no role, and that his executive sales position encompassed no authority, with respect to FDA filings, or indeed, any dealings with the FDA whatsoever. (*See* Closing Argument on behalf of Patrick, **Day 26 Trial Tr. at 190:7-9**; "So I've said enough about bucket number 1. Mr. Fabian had nothing to do with any FDA filings or submissions, nothing to do with that of any kind").

### C. Sentencing Guidelines Ranges and Sentences Available

Patrick submits that, with a Criminal History Category of I, and a total offense level of 6 (no further adjustments), the guideline imprisonment range is 0 months to 6 months, and thus within Zone A, for which no imprisonment is required. (**PSR § 130**).

### D. Policy Statements from the U.S. Sentencing Commission

There are no U.S. Sentencing Commission policy statements, of which Patrick is aware, relevant to sentencing in this case.

### E. Restitution

Restitution is not applicable to this case. (**PSR §§ 143-44**).

**IV.    THE COURT SHOULD REJECT—AS A MATTER OF LAW—ANY ARGUMENT SEEKING TO ADJUST PATRICK'S BASE OFFENSE LEVEL PREDICATED ON "LEADER/ORGANIZER" (3B1.1) BECAUSE (1) 3B1.1 LEADERSHIP ROLE LOGICALLY PRESUPPOSES UNDERLYING "CRIMINAL ACTIVITY" COMBINED WITH A DEFENDANT'S "CRIMINAL INTENT;" (2) PATRICK'S "STRICT LIABILITY" MISDEMEANOR CONVICTION CARRIED WITH IT NO REQUISITE ELEMENT OF CRIMINAL INTENT; AND (3) THE *ACTUS REUS* OF THE (MISDEMEANOR) MISBRANDING AND ADULTERATION COUNTS FOR WHICH PATRICK STANDS CONVICTED, WAS "FAILURE TO SUBMIT A PREMARKET NOTIFICATION FOR A NEW INTENDED USE,"  AS TO WHICH PATRICK HAD NO INVOLVEMENT**

> **A.    The "Role" Adjustment Set Out in Section 3B1.1, Presupposes *Mens Rea* on the Part of the Defendant and at Least *Some* of the "Participants;" Neither is Available Here**

This Court should reject the government's argument for a four-level enhancement for Patrick as a "leader/organizer" pursuant to U.S.S.G. § 3B1.1(a).  This enhancement is permitted under the sentencing guidelines only "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  As a threshold matter, there should be no adjustment available, as a matter of law, for "role in the offense,"  where the basis for defendant's conviction is one of strict liability, that is, without criminal intent.

Research has uncovered no case applying the § 3B1.1 enhancement in any strict liability or responsible corporate officer context.  A fair reading of § 3B1.1 and its application notes (the latter of which make several supporting references to "criminal organization," and "criminal enterprises") reflect that it contemplates and is designed to account for a defendant's "criminal" (i.e., accompanied by *mens rea*) leadership role over "criminal participants" engaged in a "criminal activity."  The language and construct of § 3B1.1 plainly argue against its application in any case of strict liability misdemeanor/Responsible Corporate Officer doctrine conviction, such as this.

Even aside from the foregoing, reference to "participants," as that term appears in § 3B1.1, provides no support for application of a "role in the offense" adjustment here.  U.S.S.G. § 3B1.1 provides such an adjustment "if the defendant was an organizer or leader of a *criminal activity* that involved *five or more participants* or was *otherwise extensive*."  U.S.S.G. § 3B1.1(a) (emphasis supplied).  In other words, "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others **for the purpose of carrying out the crime**."  *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990) (emphasis added).  Patrick's "strict liability" verdict once again argues conclusively against any such "criminal  purpose."

Moreover, "[t]o apply an enhancement under § 3B1.1(a), the district court must find that a defendant exercised control over *criminal actors*, rather than just planned criminal activity." *United States v. Lucena-Rivera*, 750 F.3d 43, 50 (1st Cir. 2014) (emphasis supplied) (citing *United States v. Carrero–Hernández,* 643 F.3d 344, 350 (1st Cir. 2011) (quoting *United States v. Jones,* 523 F.3d 31, 43 (1st Cir. 2008) ("[I]t is not enough that the defendant merely controlled, organized, or managed criminal activities[; he] must instead control, organize, or manage criminal *actors*.")).[6]  Further, "[a]n individual is 'criminally responsible' under § 3B1.1 only if 'he commit[s] all of the elements of a statutory crime *with the requisite mens rea*.'"  *United States v. Vega*, 826 F.3d 514, 539 (D.C. Cir. 2016) (quoting *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001)).[7]

---

[6] A "participant" under the sentencing guidelines is a "person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1(a) Application Note 1.

[7] "Because *mens rea* is an essential element of criminal culpability, an individual must have the requisite *mens rea* for the commission of a crime in order to qualify as a participant under the Sentencing Guidelines."  *United States v. Richardson*, 221 Fed. App'x 782, No. 06-6125, 2007 WL 1054702, at 785 (10th Cir. Apr. 10, 2007) (citing *United States v. Glinsey,* 209 F.3d 386, 396 (5th Cir. 2000) (to qualify as "participant" under § 3B1.1, individual must have participated "knowingly in some part of the criminal enterprise").

There is no basis, on the record of this case, to deem any of Acclarent's sales personnel as a "criminal actor," i.e., one engaged with requisite *mens rea* in a criminal activity of the sort contemplated within § 3B1.1.  Each of the government's sales representative witnesses denied any wrongdoing, much less "criminal culpability," under oath, and the government made no effort to demonstrate otherwise.  *See* n.5, *supra*.  To the contrary, each Acclarent sales representative witness testified that, rather than believe that his or her sales calls were somehow wrongful, each believed that he or she was doing good things for people suffering from chronic rhinosinusitis.  Finally, no such finding is legally possible where the sole basis for Patrick's conviction itself was devoid of *mens rea*.

 The "otherwise extensive" prong of § 3B1.1 fares no better.  Generally speaking, this prong may apply where the court considers all of the circumstances of the criminal activity, "including… the width, breadth, scope, complexity, and duration of the scheme."  *United States v. Laboy*, 351 F.3d 578, 586 (1st Cir. 2003) (quoting *United States v. Deitz*, 950 F.2d 50, 53 (1st Cir. 1991)), and in doing so, may take into account "unknowing participants."   *See* U.S.S.G. § 3B1.1 App. Note 3 ("…all persons involved in the during the course of the entire offense are to be considered" ).  While the "otherwise extensive" analysis may therefore take into account the presence of "unknowing participants," research has uncovered no case supporting a § 3B1.1 adjustment in a situation, such as here, where all of the "participants" could be deemed, at most, to have been "unknowing."  At least one Court of Appeals has ruled, however, that, to apply the "otherwise extensive" prong of 3B 1.1, "the court must determine whether the *defendant* used each non-participant's services '*with specific criminal intent.*'" *United States v. Thung Van Huynh*, 884 F.3d 160, 171 (3d Cir. 2018) (emphasis added) (citing *United States v. Helbling*, 209

F.3rd 226, 248 (3d Cir. 2000)). The jury's "no criminal intent" verdict here, rejecting the government's core theory of fraud and deceit, precludes any such determination.

In short, to apply a "role in the offense" adjustment here, the Court would essentially have to rule that the language and operation of § 3B1.1 properly encompassed circumstances of a defendant convicted solely for a regulatory, "no criminal intent" offense based on his position in the company overseeing a group of entirely "unknowing participants."  Such a ruling here, would run directly counter to the objective of § 3B1.1 and would essentially lead the way to a "role" sentencing enhancement in nearly every Responsible Corporate Officer strict liability conviction.

> **B.    Because the *Actus Reus* of the (Misdemeanor) Misbranding and Adulteration Counts for which Patrick Stands Convicted, was "Failure to Submit a Premarket Notification for a New Intended Use," No "Role in the Offense" Adjustment May Be Applied to Patrick's Guideline Range, as a Matter of Law**

In its Memorandum Order denying defendant's motion for judgment of acquittal, the Court ruled that "defendants were not convicted for their communications or their employee's communications with physicians, but rather were convicted for failing to obtain PMA approval or to submit premarket notification for a new intended use."  **Dkt. No. 516 at 55**.[8]  In this respect, the regulatory filings (or non-filings) at the center of the jury's misdemeanor verdicts were indisputably beyond the scope of Patrick's duties and responsibilities at Acclarent.  As counsel argued in closing, Patrick had no involvement in, much less authority with respect to Acclarent's FDA regulatory filings or related decisions, let alone any leadership role in that regard.  Where the Court has ruled this to be the "criminal activity' underlying Patrick's strict liability conviction, however, Patrick did not have, and may therefore not be deemed to have, for

---

[8] *See also* **Memorandum Order, Dkt. No. 516 at 31** ("…the actus reas supporting the conviction had to be the Defendants' failure to submit a premarket notification for the intended use of drug delivery.")

§ 3B1.1 purposes, <u>any</u> supervisory authority over any of the individuals involved in the

company's FDA regulatory filing process.  No "role" enhancement under U.S.S.G. § 3B1.1 may

therefore be applied to Patrick, as a matter of law.

> **C.   Application of a "Role in the Offense" Adjustment to Patrick Would—On Top of His RCO Conviction (and Corresponding BOL)—Constitute Impermissible "Double Punishment"**

Although no case law has been uncovered to this effect (likely because it is so obvious),

it seems basic to say that one should not be punished twice, or have one's punishment increased,

in the same proceeding, for the same grounds.[9]  This, without more, would seem to be not only

unfair but gratuitous, and in violation of the Sentencing Commission's mandate to impose "just

punishment."  Accordingly, no § 3B1.1 adjustment derived by reference to his executive Sales

position, already serving as the basis for his Responsible Corporate Officer conviction, should be

applied to Patrick.

**V.   THE COURT SHOULD REJECT, AS A MATTER OF LAW, ANY ARGUMENT SEEKING TO ADJUST PATRICK'S BASE OFFENSE LEVEL PREDICATED ON "ABUSE OF POSITION OF TRUST" (3B1.3) BECAUSE (1) PATRICK'S OFFENSE OF CONVICTION WAS A "NO CRIMINAL INTENT" MISDEMEANOR WHICH FAILS TO SUPPORT ANY ADJUSTMENT REQUIRING "CRIMINAL INTENT;" AND (2) ANY SUCH ADJUSTMENT TURNS UPON CUMULATIVE FINDINGS, UNSUPPORTED IN THIS CASE, OF (A) DEFENDANT'S EXPLOITATION OF A "POSITION THAT PROVIDED FREEDOM TO COMMIT A DIFFICULT TO DETECT WRONG;" AND (B) THAT SUCH POSITION "SIGNIFICANTLY FACILITATED THE COMMISSION OR CONCEALMENT OF THE OFFENSE"**

U.S.S.G. § 3B1.3 provides that a two-point adjustment to a defendant's base offense level

may be made "[i]f the defendant abused a position of public or private trust, or used a special

skill, in a manner that significantly facilitated the commission or concealment of the offense."

---

[9] An analog to the argument against "double counting" appears, in the "Abuse of Position of Trust" adjustment set forth in U.S.S.G. § 3B1.3: "This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."

"To apply the enhancement, 'the district court must <u>first</u> decide that the defendant occupied a position of trust and <u>then</u> find that [he] used that position to facilitate or conceal the offense.'" *United States v. Sicher*, 576 F.3d 64, 71 (1st Cir. 2009) (quoting *United States v. Gill*, 99 F.3d 484, 489 (1st Cir. 1996) (emphasis supplied)).  "The 'central purpose' of the enhancement 'is to penalize[ ] defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong.'"  *United States v. Agyekum*, 846 F.3d 744, 753 (4th Cir. 2017) (quoting *United States v. Brack*, 651 F.3d 388, 393 (4th Cir. 2011)).  These circumstances provide neither the requisite "position of trust" nor "use of position to facilitate or conceal the offense" and may therefore not be applied to Patrick.  More immediately, however, "this adjustment <u>may not be employed</u> if an abuse of trust or skill is included in the base offense level or specific offense characteristic."  U.S.S.G. § 3B1.3.  This language effectively precludes the application of the enhancement in this case as Patrick's "position" has already been accounted for in his "RCO" conviction, and thus his corresponding base offense level.

A.  **Application of an "Abuse of Position of Trust" Adjustment to Patrick Would—On Top of His RCO Conviction (and Corresponding BOL)— Constitute Impermissible "Double Punishment"**

As noted, U.S.S.G. § 3B1.3 explicitly provides that "this adjustment <u>may not be employed</u> if an abuse of trust or skill is included in the base offense level or specific offense characteristic."  Here, Patrick's BOL under § 2N2.1, comes to Level 6, on the RCO conviction for misbranding/adulteration.  In this case, therefore, Patrick's position as VP-Sales has already been effectively taken into account, for purposes of his Base Offense Level.  In addition, and for the reasons previously advanced (*see* § IV.C, *supra*) no § 3B1.3 "Abuse of Position of Trust"

adjustment also derived by reference to his executive sales position and already serving as the basis for his responsible corporate officer conviction, should be applied to Patrick.[10]

**B.** **Patrick's Offense of Conviction Was a "No Criminal Intent" Misdemeanor which Fails to Support any Adjustment, such as "Abuse of Position of Trust," in Turn Requiring "Criminal Intent"**

As noted, the jury convicted Patrick of misdemeanor misbranding and adulteration offenses, on an RCO theory of liability, for "failing to obtain PMA approval or to submit premarket notification for a new intended use." Absent a "criminal intent" offense predicate, no such "position of trust" adjustment may be applied here. The cases cited by the government in its Objections to the PSR are inapposite, as all involved "position of trust" adjustments to criminal (knowing or intentional) conduct that is absent here. *See United States v. Gonzalez-Alvarez*, 277 F.3d 73, 76, 81-82 (1st Cir. 2002) (defendant intentionally adulterated milk by adding water and salt that would avoid detection in quality control tests); *United States v. Stella*, 591 F.3d 23, 25-26 (1st Cir. 2009) (defendant convicted for stealing painkillers for her own personal use by depriving patients of that medicine and concealing her theft); *United States v. Pruett*, 681 F.3d 232, 237, 249 (5th Cir. 2012) (defendant convicted of knowingly violating effluent limitations and record keeping requirements under Clean Water Act and defendant controlled all aspects of the business including actions to comply with permits); *United States v. Bracciale*, 374 F.3d 998, 1001-02 (5th Cir. 2004) (defendant pled guilty to wire fraud for intentionally arranging a scheme where an unauthorized customer received discounted price and defendant profited personally). In the absence of any predicate ("knowing" or "intentional")

---

[10] "[A] 'sentencing court must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust or 'the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise' would receive a section 3B1.3 enhancement." *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010) (internal citations and quotations omitted).

criminal conduct here, no abuse of position of trust enhancement may be applied, as a matter of law.

### C. Patrick's Position of VP-Sales Could Not and Did Not (1) Constitute Any "Freedom to Commit a Difficult to Detect Wrong;" or (2) "Significantly Facilitate the Commission or Concealment" of the Offense of Conviction

Because the jury convicted Patrick of misdemeanor misbranding and adulteration offenses, on an RCO theory of liability, for "failing to obtain PMA approval or to submit premarket notification for a new intended use," no § 3B1.3 "abuse of position of trust" adjustment is applicable here, as a matter of law.  Patrick occupied no position of trust with respect to Acclarent's FDA dealings or filings with the FDA, and therefore could not (and obviously did not) use any such position to "facilitate or conceal" such offense.  *United States v. Flecha-Maldonado*, 373 F.3d 170, 180 (1st Cir. 2004) (government bears burden to show 'that the defendant (1) was in a position of public or private trust and (2) abused that trust in a manner that significantly facilitated the commission or concealment of the crime'").  Here, the basis of the conviction was an inadequate regulatory filing.  Patrick undisputedly, had no role in that filing process, and thus could not be deemed to have abused any position of trust with regard to the filing.

## V.   CONCLUSION AND RECOMMENDATION

18 U.S.C. § 3553(a) calls for the Court to impose a sentence that is "sufficient but not greater than necessary" to serve the purposes of sentencing. Here, Patrick respectfully requests that, to that end, the Court determine his total offense level to be Level 6 (Criminal History Category I) and thus falling within Zone A of the Sentencing Table.

Further, in recognition of the jury's unmistakable conclusion that he engaged in no fraud or deceit whatsoever, and for all of the foregoing reasons, Patrick Fabian respectfully requests that the Court in turn exercise its substantial discretion and consider the time Patrick has spent on

(significant) conditions of release over the last five-plus years "just punishment" for this strict liability offense.  Patrick further respectfully requests that his fine, if any, be at the low end of the applicable Guideline range.

<div style="margin-left: 50%;">

Respectfully submitted,

**DEFENDANT PATRICK FABIAN**

By: */s/ Frank A. Libby, Jr.*
FRANK A. LIBBY, JR. (BBO No. 299110)
BRIAN J. SULLIVAN (BBO No. 676186)
Libby Hoopes Brooks, P.C.
399 Boylston Street Suite 600
Boston, MA 02116
Tel. (617) 338-9300
falibby@lhblaw.com
bsullivan@lhblaw.com
</div>

Dated:  January 6, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on January 6, 2021.

<div style="margin-left: 50%;">

*/s/ Brian J. Sullivan*
Brian J. Sullivan
</div>