### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 15-10076-ADB |
| WILLIAM FACTEAU, | ) | |
| PATRICK FABIAN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM AS TO PATRICK FABIAN

The United States submits this memorandum in support of the following sentencing recommendation for Defendant Patrick Fabian:  five months of incarceration, followed by five months of home confinement, one year of supervised release, a fine of $500,000, and a special assessment of $250.  The Government's recommendation is justified by Fabian's direct and personal involvement in distributing the Stratus for drug delivery, by his abuse of a position of trust, and by his extensive and hands on approach in directing those beneath him in the sales organization to distribute adulterated and misbranded Stratus devices.

As the Court recognized in denying Defendants' post-trial motions, the evidence at trial "clearly demonstrated that Defendants directly and personally participated in the charged conduct."  *United States v. Facteau*, 2020 WL 5517573, at *18, FN 140 (D. Mass. Sept. 14, 2020).  This is not a case where the jury convicted Fabian based solely on his position as a responsible corporate officer.  As the Vice President of Sales for Acclarent for over 4 years, Fabian was involved in the key decision to go forward with the launch of the Stratus in 2008 knowing it offered no clinical benefit as a spacer with saline and knowing that it was specifically designed to slowly elute Kenalog 40 (not saline, which ran out in minutes).  He was instrumental in overseeing and helping to implement a training and sales program under which representatives

(a) were told how to sell the Stratus as a drug delivery device, and (b) were **never** told how to sell the Stratus for its only cleared intended use – as a spacer with saline.  Fabian was not just a passive participant who was aware of criminal conduct.  He was not simply negligent in failing to prevent that conduct.  Instead, he was an instrumental force in orchestrating the conduct of an entire sales organization that resulted in the distribution of approximately $40 million worth of misbranded and adulterated Stratus devices.  To hold him accountable for his actions and to send a message to other health care executives who attempt to sidestep the FDA and ignore the advice of their compliance departments, he should be sentenced to a period of incarceration.

I.    **SUMMARY OF EVIDENCE**

Facteau and Fabian caused illegal sales of the Relieva Stratus Microflow Spacer ("Stratus") for intended uses for which it had not been cleared or approved by the FDA.  Stratus was a medical device for implanting a small balloon with micropores in an individual's sinuses.  Facteau and Fabian knew the Stratus was designed and intended to provide sustained delivery of drugs – in particular, steroids – to the sinuses.  Both knew it did not work for the use for which the FDA had cleared it:  as a spacer with saline.  From about 2008 through 2011, Facteau and Fabian caused the Acclarent sales and marketing teams to sell the Stratus intending that it be used as a steroid delivery device.

Throughout that period, as the Vice Present of Sales and later Vice President of Worldwide Sales and Training, Fabian directed – and was personally involved in – a sales program:  (1) that taught Acclarent sales reps to sell the Stratus as a drug delivery device, (2) that provided promotional materials showing the product used **only** with Kenalog or a milky white substance that mimicked the look of Kenalog, (3) that rewarded and promoted sales representatives who successfully sold the Stratus as a drug delivery device and used (and shared) homemade marketing materials that focused on drug delivery, and (4) that failed to provide any

training on how sales reps should sell the Stratus for its only cleared use as a spacer with saline. The testimony of the seven sales representatives who testified at trial, as well as the recordings of two sales representatives-turned-managers made this clear.

### Facteau and Fabian Launched the Stratus Intending It to Be Used for Steroid Delivery Without FDA Clearance

Facteau, Fabian and others at Acclarent launched the Stratus in early 2008 even though they did not have FDA clearance for the device to be used for drug delivery.  They only intended the device to be used for drug delivery.  Under the direction of Fabian and Facteau, from about February 2008 through 2011, Acclarent distributed the Stratus to physicians intending that they use it for steroid delivery and for implantation longer than 14 days, while purporting to distribute it for its FDA-cleared use as a spacer with saline.

### Facteau and Fabian Helped Position Stratus as a Drug Delivery Device Through Internal Training and External Promotional Materials

In the summer of 2008, Facteau and Fabian prepared for a full commercial launch of the Stratus and began the process of positioning the Stratus – through internal training materials and external promotional materials – as a drug delivery device.  Sales and promotional materials provided to the Acclarent sales force did not promote the Stratus it for its FDA-cleared intended use as a spacer.  Instead, those materials promoted the Stratus to deliver a fluid to bathe the sinuses.  The primary Stratus sales brochure given to sales representatives had a picture of the Stratus inflated with a milky white substance intended to look like Kenalog-40 – not clear saline. The only video of the Stratus given to the sales force to use showed the device being used to deliver Kenalog 40.[1]  Beginning in late summer 2008, under the direction of Fabian, Acclarent

---

[1] GX2424 (Stratus targeted local bathing brochure); GX664 (video of Stratus being used with Kenalog); GX684 (powerpoint showing multiple photos of Stratus containing milky white substance).

representatives began sharing these promotional pieces with doctors to whom they were selling the Stratus as a steroid delivery device.  No tools were provided to Fabian's sales force to assist them in highlighting the benefit of using the Stratus for its cleared use as spacer with saline.

Also, on September 16, 2008, Facteau conducted two nationwide conference calls with the entire sales force and with Fabian in attendance.[2]  Facteau's notes indicate that he planned to tell Fabian's sales force to talk to physicians about using Stratus with Kenalog to provide for a an "opportunity for a pharmacological approach" to sinusitis.[3]  The sales force was not instructed on how to sell the Stratus for its only cleared use – as a spacer with saline.

### Fabian's Involvement in Overseeing and Executing a Training Program and Sales Program Aimed at Selling the Stratus as a Device to Deliver Drugs.

As the company's most senior sales executive, Fabian directed and personally participated in Acclarent's sales training program.  That program provided zero guidance on how to sell the Stratus for its cleared intended use as a spacer with saline.  Sales representatives who testified at trial described Fabian's hands-on approach (which included one-on-one field rides with sales reps) and the "intense" new hire sales training sessions he attended and oversaw.  Those training activities included presentations and role plays positioning the Stratus as way to provide targeted medical therapy – *i.e.*, steroids – to the sinuses:

- Sales representative Eric Krinsky described how it was "unusual" to see a Vice President of Sales attend new hire sales training the way Fabian did.  He explained how Fabian would stand at the back of the classroom and participate in role plays.  He described how Fabian and others at the training taught to him that the holes in the Stratus were designed specifically to elute Kenalog over time and that the selling point of the Stratus was that it provided "targeted therapy" – meaning the delivery of Kenalog ("triamcinolone").  Krinsky also testified about the role plays Fabian personally participated in at new hire training and the probing question strategies he learned that were aimed at getting the doctors to

---

[2] *See* GX959

[3] *See* GX2550_001; *See United States v. Facteau*, 2020 WL 5517573, at *7 (D. Mass. Sept. 14, 2020).

realize the need for targeted medical therapy.  No guidance, however, was provided during the new hire training about how the device could work successfully as a spacer.[4]

- Kevin Convery, a sales representative who was later promoted to sales training manager, described a presentation he gave 4-6 times at the new hire trainings in which he taught recently-hired sales reps how to sell the Stratus as a drug delivery device to provide "targeted medical therapy."  Despite providing this presentation multiple times at new hire trainings no one ever told him to stop giving it.[5]

- Sales representative Benjamin Steffen described attending the "intense" 2-week new hire training and how Fabian attended the classroom portion of the training, overseeing it from the back of the classroom.  Steffen explained that, during the entire training attended by Fabian, he was never taught that the Stratus had any benefit as a spacer to hold open a space or elute saline.[6]

Outside of the formal new hiring training, the evidence at trial showed that Acclarent's training in the field focused only on Stratus's ability to deliver drugs.  With Fabian's knowledge, sales representatives training physicians on how to use Stratus were provided supplies so they could demonstrate the Stratus in way that "mimicked" its use with Kenalog.[7]  According to sales representatives in Fabian's organization, no one at the company trained them on how Stratus to recommend the Stratus as a spacer with saline or how it could be beneficial for that cleared use.[8]  This omission regarding the benefit of the Stratus as a spacer with saline stood in stark contrast

---

[4] Krinsky Tr. 10:25-27, 34.  Throughout this memorandum, the Government cites to the transcripts by identifying the witness who was testifying (here, Krinsky), the day of trial as identified on the front page of the transcript (here, Day "10"), and the page number (here, pages 25-27).

[5] Convery Tr. 9:110; *see* GX1364.

[6] Steffen Tr. 7:80-82.

[7] *See* GX1402 (training protocol sent to sales force, with a copy to Fabian, showing coffee creamer would be used for Stratus training); Logan Tr. 10:62 (describing how Stratus was demonstrated with physicians using white coffee creamer, which mimicked the look of Kenalog); Convery Tr. 9:50.

[8] *See* Logan Tr. 10:65; Ader Tr. 11:26; Vanderkarr Tr. 5:42.

to conference calls inviting the entire sales force to hear a colleague's talk track positioning the Stratus as device to deliver drugs.[9]

One of the largest events on the calendar for Fabian's sales force was Acclarent's National Sales Meeting held in January of each year.  Fabian attended and presented at the January 2009 edition of this meeting – just months after the full launch of the Stratus.[10] Consistent with the new hire training Fabian oversaw and the informal field training of which he was aware, the training at the National Sales Meeting positioned the Stratus as a drug delivery device.

- One session saw a sales representative, Mollie Vanderkarr, on stage doing a role play where she positioned the Stratus as drug delivery device.  Rather than cautioning Vanderkarr, Fabian personally praised her for her performance.  She was later promoted to a regional manager in the sales organization after interviewing with Fabian.[11]

- In another session, a physician gave a presentation using a powerpoint, edited by members of the marketing department and sent to Fabian in advance, which discussed using Stratus with steroids, asking the question: "What is the benefit of targeted bathing of the frontal sinus with steroid?"[12]

- In yet another session, two sales representatives gave a powerpoint presentation in front of the entire Acclarent sales force in which they positioned the Stratus as a way to "melt away" polyps and "quiet the mucosa" – something the sales representatives understood required the use of Kenalog-40.  Fabian was provided the slide deck used in advance of this presentation.[13]

---

[9] *See* GX1053; GX1518; Convery Tr. 9:64-71 (Convery explaining that he described how he sold the Stratus on the sales conference call in the same way he described it in GX1518, which was as a drug delivery device); Convery Tr. 9:71 (there were no sales force meetings where the benefit of Stratus as a spacer with saline was discussed).

[10] *See* Logan Tr. 10:106; Convery Tr. 9:73.

[11] *See* Convery Tr. 9:82; Vanderkarr Tr. 5:102, 114, 140-41.

[12] *See* GX1155 (presentation by Dr. Brandeisky sent to Fabian)

[13] *See* Logan Tr. 10:112; GX 1166; GX1156 (sales representatives' presentation sent to Fabian)

Later during the meeting, an Acclarent regulatory employee told those in attendance to only sell for cleared or approved uses, not to train physicians to use products inconsistent with their cleared indication, and not to solicit and prompt customer questions regarding off-label uses.[14]  This made one sales representative uncomfortable because, as she described it, the entire probing sequence of questions taught was aimed at using Stratus with Kenalog.[15]  Another sales representative testified that the sales training and regulatory training he received were inconsistent.  In selling Stratus, however, he followed "the sales force training" because:

> That's what I was told to do … That's how we were trained. …[T]here was a lot of pressure to sell Stratus, and if you didn't follow the training and strategies that were given to you by the company and you stayed on the FDA, you wouldn't have sold the Stratus.  It was never used with saline.  It was only used with Kenalog-40.

Ader Tr. 11:34-35; *Id.* at 58 ("Management from all levels … your managers were telling you to sell the product and sell the product with drug delivery".)

Not surprisingly, these messages from (1) the 2008 product launch call with Facteau and Fabian, (2) the new hire training overseen by Fabian, and (3) the National Sales Meeting attended by Fabian were reinforced in numerous ways throughout the Acclarent sales force:

- Sales reps created and shared marketing materials and messages that positioned the Stratus as a drug delivery device.[16]

---

[14] *See* GX11172 (regulatory slides); Logan Tr. 10:116-17; Ader Tr. 11:33-35.

[15] Logan Tr. 10:116-17.

[16] *See, e.g.*, GX817 (Logan sales tool); GX1518 (Convery sales tool); GX1 & GX2491 (FESS by Numbers presentations); GX1648 (sales rep email discussing how Stratus would melt away polyps); GX1573 (email from manager to team of sales reps encouraging them to push Stratus as a way to "treat" the sinus); GX2284 (transcript of Total Ostomy talk given by sales representative Tim Steele).

- Experienced representatives led conference calls with collections of sales representatives to discuss how they sold the Stratus for use with Kenalog.[17]

- Successful sales representatives who touted the Stratus as a drug delivery device were rewarded, promoted, and their colleagues were encouraged to seek them out and learn their techniques.[18]

- Fabian and sales managers under him encouraged their sales representatives to "get in front" of those successful reps who were selling the Stratus as a drug delivery device.[19]

### Fabian's "Ride Alongs" with Sales Representatives After Which he Encouraged Them to Sell the Stratus for Medical Management

Fabian also personally and directly encouraged sales representatives to position the Stratus as a drug delivery device.  In numerous instances, he rode along with sales representatives in the field as they sold Acclarent products.  After these "ride-alongs," Fabian would follow up in writing with his charges, telling them, among other things, to position the Stratus as an extension of "medical management" – a reference to using Stratus with drugs.[20]

---

[17] *See, e.g.* Bilsbury Tr., 11:91-92 (discussing regional conference call where sales rep Tim Steele described to other reps and a manager how he positioned the Stratus as a device to delivery Kenalog); GX1053; GX1059; Convery Tr. 9:60-67, 69-71 (describing conference call to which entire Acclarent sales force was invited in which Convery discussed his Stratus Talk track, which described it as a device to deliver steroids  (GX1518 (Convery sales tool)).

[18] *See* Steffen Tr. 7:124 (Jason Elmore, author of FESS by Numbers, promoted to director of education); Bilsbury Tr. 11:91 (Tim Steele, originator of Total Ostomy talk (GX2284), was once a sale representative and later promoted to manager); Convery Tr. 9:120 (Kevin Convery, author of GX1364, which touted Stratus as a device to provide targeted medical therapy, was promoted to manager of sales training).

[19] *See* Steffen Tr. 7:105-110 (Fabian would send emails to regional managers saying "look at what Elmore is doing"); Convery Tr. 9:108 (Elmore gave FESS by Numbers presentation to 35-40 sales reps at a time); Bilsbury Tr. 11:75, 85 (told to speak with Elmore by Bob Wood; told by manager Mollie Vanderkarr to circulate transcript of Elmore's FESS by Numbers talk to Ohio Valley sales team).

[20] *See* GX1538 (Fabian email to sales rep noting "Stratus is just an extension of medical management / a delivery system…"); GX1290 (same); GX1225 (same); GX1488 (same); GX1238 (same); GX1318 (same); GX1640 (same); *see also* Ader Tr. 11:35-37 (understood Fabian's email to direct the sale of the Stratus as a medical management device); Bilsbury Tr. 11:72-73 (testifying about email from Fabian suggesting use of talk track regarding treating polyps with Stratus, which Bilsbury knew meant using Kenalog).

**Fabian's Direction to the Sales Force to Continue to Sell the Stratus**
**After Johnson and Johnson Directed That the Product Be Moved to Catalog Only**

Even after Johnson & Johnson purchased Acclarent in 2010 and directed that the Stratus be placed on "catalog only" status in recognition of its extensive off-label use, Fabian – in direct contradiction of Johnson & Johnson's explicit directive to stop all promotion of the product – continued to direct Acclarent employees to market the Stratus in a July 2010 email, explaining that "declining Stratus business (ignoring stratus business) has shown a strong correlation to declining core business."  Months after the catalog-only decision, in August 2010, Fabian forwarded to his sales managers an email explaining that "successful reps continue to sell Stratus, which in turn drives BSP sales."[21]

## II.     GUIDELINES CALCULATION

   A.     <u>As the Court Recognized, the Evidence at Trial Established that the Criminal Activity Involved More Than Five Participants and Was Otherwise Extensive Under USSG § 3B1.1(a).</u>

The evidence at trial demonstrated that Facteau and Fabian directed the criminal conduct for which they were convicted and that most, if not all, of the Acclarent sales force carried out that conduct.  Thus, Fabian and Facteau were organizers and leaders of criminal activity that involved five or more participants and was otherwise extensive under USSG § 3B1.1(a).

The evidence showed that the Fabian-led sales force of over 100 representatives and managers was trained to sell the Stratus – and did sell the Stratus – solely for a use that they knew the FDA had not cleared:  as a drug delivery device with Kenalog-40.[22]  Sales

---

[21] *See* GX1949, GX2064.

[22] *See*, *e.g.*, GX959 (invitation to September 2008 national conference call held by Facteau and attended by Fabian where entire Acclarent sales force received direction on how to position Stratus as drug delivery device); GX2550_001 (Facteau's notes for September 2008 national conference call reflecting that he planned to talk about using Stratus with Kenalog-40 to

representatives and managers testified at trial that they were trained and encouraged – in some instances by Fabian personally – to sell the Stratus for steroid delivery.  They learned from their training that the Stratus did not work for its FDA-cleared use as a spacer with saline:

- Molly Vanderkarr, sales representative and manager: Vanderkarr Tr. 5:123-24 (she understood a manufacturer may sell products only for cleared/approved uses, she never sold Stratus for its cleared intended use); Vanderkarr Tr. 5:143-44 (she did not want to put her off-label discussions in writing because she knew they were wrong; for this reason, she told sales representative Jason Elmore to remove the word "drug" from an email, while still intending the same message); Vanderkarr Tr. 6:15-17 (sales talk by sales representative Tim Steele recommended the Stratus as steroid delivery device and was discussed as successful in calls with Fabian); Vanderkarr Tr. 7:35-37 (she sold more than $1 million of Stratus); Vanderkarr Tr. 7:49-50 (she did not sell the Stratus solely for its FDA-cleared indication); Vanderkarr Tr. 7:61-63 (no one in the sales force followed regulatory training in selling Stratus; throughout time she sold Stratus, she encouraged doctors to use it with Kenalog-40).

- Kevin Convery, sales representative and trainer: Convery Tr 8:203; Convery Tr. 9:17 (the Acclarent R&D team, including Dan Latimer, Dan Harfe and/or John Chang, described the device to doctors as a drug delivery device); Convery Tr. 9:32-35 (he prepared sales material discussing Stratus's use for drug delivery and shared that tool (GX1518) with physicians, other sales representatives, and managers).

- Barbara Logan, sales representative: Logan Tr. 10:66 (she never recommended Stratus for FDA-cleared use); Logan Tr. 10:72 (she understood it was designed for bathing w/ Kenalog).

- Bradford Ader, sales representative: Ader Tr. 11:34 (he never sold Stratus for cleared or approved intended use, his sales training was inconsistent with the regulatory training); Ader Tr. 11:37, 59 (Fabian rode with him on sales calls; he followed Fabian's direction to sell Stratus for medical management / drug delivery, the direction from management was to sell the device for drug delivery).

- Norman Bilsbury, sales representative: Bilsbury Tr. 11:74 (he understood Stratus was designed for use with Kenalog, this was consistent message in training and sales talks "FESS by the Numbers" that Elmore created and taught to sales representatives); Bilsbury Tr. 11:85 (he used FESS by Numbers presentation to sell Stratus for drug delivery and it improved his business); Bilsbury Tr. 11:90-95 (he heard "Total Ostomy" sales talk Tim Steele created and it sold Stratus for drug delivery (GX2284)).

- Eric Krinsky, sales representative: Krinsky Tr 10:24-26; 33-34 (the Acclarent sales

provide "an opportunity for a pharmacological approach"); GX 2533 at 28-29 (listing sales unit employees)

training staff, including Fabian and other managers, "taught" the sales reps that the Stratus was intended to be used with Kenalog; he was not taught that the Stratus had any clinical benefit as a spacer; he was taught that the "selling point" of the Stratus was "targeted medical therapy" with Kenalog-40; no one at Acclarent told him Stratus had clinical benefit as a spacer with saline).

- Benjamin Steffen, sales representative: Steffen Tr. 7:87 (he was never trained about any clinical benefit of Stratus as a spacer and knew that saline "came right out").

- The evidence at trial also included two, lengthy audio recordings and talk tracks that sales representatives Jason Elmore, Tim Steele and others used to sell the Stratus as a steroid delivery device.[23]

While the testimony from just these seven witnesses shows that criminal activity involved more than five participants and was otherwise extensive, the evidence at trial showed that the scheme was far broader:  the ***entire Acclarent sales force*** understood from Defendants Facteau and Fabian that they were to sell the Stratus as a drug delivery device – a use for which they knew it was not FDA-cleared.  *See Facteau*, 2020 WL 5517573, at *7 (describing 2008 conference call Facteau held with the entire sales force, including Fabian, and Facteau's notes indicating he planned to tell the sales team to talk to physicians about using the Stratus with Kenalog).

---

[23] GX0001 (Elmore's FESS by the Numbers presentation); GX1425.001-002 & 1423 (Audio recording of FESS by the Numbers).  Fabian praised Jason Elmore, the author of FESS by Numbers, and the Acclarent sales force noticed and used it.  *See e.g.* 5 Trial Tr. 159-160 (Vanderkarr: put her name on Elmore's slides to use with a surgeon for a presentation); 7 Trial Tr. 122-123 (Steffen: regional managers encouraged the sales representatives to "get in front of [Elmore] … to learn from him" and Fabian specifically wrote emails about Elmore's approach, which included telling surgeons how to use the Stratus as a drug delivery device); 10 Trial Tr. 48-41 (Krinsky: testifying that his manager, Jason Elmore, wanted "all of his reps" to study Elmore's "Fess by Numbers" presentation – which touted the use of Stratus as a drug delivery device – so that they could give it to customers); 11 Trial Tr. 84-85 (Bilsbury: gave FESS by the Numbers presentation more than once and it improved his business); GX2284 (transcript of Timothy Steele "Total Ostomy" talk); GX2283_001 (audio of Timothy Steele Total Ostomy talk which discussed using the Stratus as a drug delivery device).

Based upon the evidence at trial, the Court also ruled that statements of at least four other Acclarent employees were admissible under *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) because they were made during, and in furtherance of, a conspiracy: (1) Dan Harfe, a marketing manager, Tr. 21:9-10; (2) Matt Salkeld, Director of Western Sales, *id.* at 21-22, (3) Jason Elmore, sales representative and manager, *id* at 24-25, and (4) Timothy Steele, sales representative and later manager, *id.* at 27-28. Thus, based upon the Court's ruling as to these four employees, the seven sales representatives whose testimony is cited above, and the jury's findings as to Facteau and Fabian, there were more than five participants in the criminal activity.

The Court's decision denying Defendants' post-trial motions also recognized that there was evidence showing that far more than five individuals participated in the criminal conduct. The ruling identifies no fewer than eight sales representatives or managers in Fabian's sales organization who participated in selling the Stratus for drug delivery. *See Facteau*, 2020 WL 5517573, at *7-12 (describing activities by Vanderkarr, Convery, Ader, Logan, Steffen, Elmore, Bilsbury, Sean Riley, and unspecified "trainers"). The Court also concluded: "The Government provided ample evidence of promotional activities directed specifically at Massachusetts physicians and more nationally regarding the use of the Stratus for drug delivery." *Id.* at *19. Thus, the evidence demonstrated both that there were more than five criminally responsible participants and that the criminal conduct was otherwise extensive.

This four-level enhancement also is required because the criminal conduct was otherwise extensive. Most of the 100-plus employees at Acclarent were involved in the offense of distributing 30,000 or more Stratus devices over a period of several years. *See* USSG § 3B1.1, Application Note 3 (noting that, "in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are

12

considered.  Thus, a fraud that involved only three participants but used the unknowing

services of many outsiders could be considered extensive."); *United States v. Arbour*, 559

F.3d 50, 53 (1st Cir. 2009) (The disjunctive language of § 3B1.1(a) is important --- a

criminal activity may be extensive even if does not involve five or more participants).

Thus, Fabian's offense level should include the four-level enhancement because

there were five or more participants in the criminal activity for which the defendants were

convicted and of which they were organizers and leaders.  *See United States v. Chin*, 965

F.3d 41 (1st Cir. 2020) (vacating sentence where court did not include four-point

enhancement for pharmacist who participated in corporate FDCA scheme).

B.      Because Fabian Occupied a Position of Trust and Used it to Carry Out the
        Crimes, a 2-Level Enhancement Under USSG § 3B1.3 Is Warranted.

As the Vice President of Sales at Acclarent, Fabian's crimes of conviction also involved

abuse of a position of trust under USSG § 3B1.3.  Along with Facteau, Fabian launched the

Stratus without FDA clearance for its intended use as a steroid delivery device.  *See, e.g.,*

*Facteau*, 2020 WL 5517573, at *7-9.  He thus used his senior executive position and managerial

discretion to help carry out these crimes.

Application Note 1 to § 3B1.3 defines a position of public or private trust as

"characterized by professional or managerial discretion (*i.e.* substantial discretionary judgment

that is ordinarily given considerable deference)" and notes that "[p]ersons holding such positions

ordinarily are subject to significantly less supervision than employees whose responsibilities are

primarily non-discretionary in nature."  *Id.*

Fabian fits § 3B1.3 definition in that he was the highest-ranking employee in the sales

organization overseeing 100+ sales representatives.  He had a significant amount of discretion in

terms of how he directed his sales force to conduct itself.  He used that discretion to help

Acclarent position the Stratus – through internal training and external promotion – for drug delivery. *Facteau*, 2020 WL 5517573, at *7. As the leader of the sales representatives who would be directly communicating with physicians about a device they would be implanting in their patient, Fabian – like Facteau – was obligated to conduct himself in a way that would protect the public health and not just increase his company's sales.[24] The First Circuit has ruled that such conduct constitutes an abuse of a position of trust under USSG § 3B1.3. *See United States v. Gonzalez-Alvarez*, 277 F.3d 73, 81-82 (1st Cir 2002). In reversing a district court's decision not to include the abuse of position of trust enhancement for a defendant who sold adulterated milk in violation of FDCA, the Court explained:

> [W]e consider relevant to a § 3B1.3 inquiry whether the public expects that people in the position of the defendant will comply with health and safety regulations for which they are responsible. … The public was entitled to have dairy farmers like Gonzalez–Alvarez provide milk to processing plants compliant with all FDA and ORIL regulations, and accordingly we conclude that the defendant occupied a position of public trust.
>
> Gonzalez–Alvarez provided contaminated milk to Tres, intending that it reach the public in its adulterated state. It is clear from the record that his position as an ORIL-licensed dairy farmer significantly facilitated his commission of this offense. *See* U.S.S.G. § 3B1.3. We therefore hold that Gonzalez–Alvarez abused the position of public trust with which he was entrusted, and that the district court should have applied a 2–level enhancement pursuant to § 3B1.3.

*Id.* (citations omitted).

---

[24] *See also United States v. Stella,* 591 F.3d 23, 27-29 (1st Cir. 2009) (upholding abuse of trust enhancement where nurse had discretion and unsupervised access to drugs); *United States v. Pruett*, 681 F.3d 232, 248-49 (5th Cir. 2012) (applying § 3B1.3 enhancement to president and chief executive officer of waste water treatment company for environmental crime on ground that use of position facilitated the commission or concealment of the offense because he had discretion to decide what efforts were taken to comply); *United States v. Bracciale*, 374 F.3d 998, 1005 (5th Cir. 2004) (holding that defendant who was regional sales manager at Kraft Foods "occupied a position of private trust at Kraft" and "that his position of private trust significantly facilitated the commission of the offense").

In assessing whether the abuse of a position of trust enhancement is appropriate here, it is important highlight the Court's conclusion that the evidence at trial was sufficient to support Facteau's and Fabian's convictiond not solely by virtue of their positions in the company, but due to their personal and direct participation in the illegal conduct.  *Facteau*, 2020 WL 5517573, at \*18, FN 140 ("This Court, however, does not need to grapple with the limits of *Park* and strict liability in the context of this case because the evidence here ***clearly demonstrated*** that ***defendants directly and personally participated in the charged conduct***." (emphasis added)).  Because Facteau and Fabian used their positions of both public trust (as to public health) and private trust (as senior executives at Acclarent) to carry out the crime, a two-point enhancement to their offense level under § 3B1.3 is required.

C.    Final Calculation of Guidelines

The correct calculation under the Sentencing Guidelines, therefore, is as follows:

(i)    in accordance with USSG § 2N2.1, Fabian's base offense level is 6 because the offenses of conviction involved violation of "Statutes and Regulations Dealing with Any Food, Drug, Biological Product, Device, Cosmetic, Agricultural Product or Consumer Product";

(ii)   in accordance with USSG § 3B1.1(a), Fabian's offense level is increased by 4, because he and Facteau were organizers and leaders of criminal activity that involved five or more participants or was otherwise extensive; and

(iii)  in accordance with USSG § 3B1.3, Fabian's offense level is increased by 2 because he abused his of position of public or private trust or special skill.

Fabian's total offense level, therefore, is 12 (10-16 months).

III.    **APPLICATION OF GUIDELINES AND SECTION 3553(a) FACTORS**

Application of the factors outlined in 18 U.S.C. § 3553(a) supports the recommended prison sentence for Fabian.

A.    Nature, Circumstances, and Seriousness of the Offenses

Fabian's crimes are serious and significant.  Fabian was the Vice President of Sales at

Acclarent and in charge of a 100-person sales force responsible for personally interacting with physicians and selling to them a product that would be implanted in a patient's skull, next to their brain. As described in more detail in the Government's sentencing submission relating to Facteau, preserving the effectiveness and integrity of the premarket clearance and approval processes for medical products serves an important governmental interest in protecting public health and safety. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 369 (2002). Like Facteau, Fabian's conduct in this case imperiled this important government interest and makes imposition of a prison sentence appropriate.

B.    History and Characteristics of the Defendant

Fabian was a well-compensated senior executive when he arrived at Acclarent and before the Stratus was launched. Despite having a prominent, well-paid position, he chose to push the envelope at Acclarent and use his senior position to direct his sales force to sell the Stratus for a use he knew it was not cleared for. He did so to make Acclarent look like a profitable acquisition target, which would mean (and did mean) a significant financial benefit to him – the $4 million payout he received when Johnson and Johnson bought Acclarent for $785 million in 2010.

The Government is not suggesting that generating profits is improper, or that finding motivation in financial reward is wrong. Here, however, increasing profits meant violating the rules. In directing his sales force – through internal training and external promotion – to position the Stratus as a drug delivery device, Fabian put the sales representatives working under him in an impossible position: They were given a device that did not work for its only cleared use as a spacer with saline. They were not given any training or promotional materials touting its benefit for that cleared use. The materials and techniques they *were* provided to sell the device focused on an intended use that the FDA refused to clear. They were then expected to sell that product

16

and hit their sales numbers using techniques received in sales training that were inconsistent with the regulatory training they received (i.e., not to sell it for anything other than its cleared use as a spacer with saline.).  Fabian was not the one in the physician's office tasked with doing this dance; the sales representatives under him were the ones put in that unenviable position. *Compare* Ader Tr. 11:58 ("Management from all levels … your managers were telling you to sell the product and sell the product with drug delivery") *with* GX1861 (catalog only announcement observing that sales representatives at other device companies had been charged or entered guilty pleas for misbranding).

As with Facteau, there are no significant mitigating personal circumstances in Fabian's case.  He was not in dire financial straits – far from it.  PSR ¶¶ 110, 120.  Fabian was seeking to advance his own ambition, his company's financial interests, and his own financial interests. When someone in that position of responsibility takes advantage of that position to make more money, a sentence of incarceration is appropriate.

      C.    <u>Need to Promote Respect for the Law and Just Punishment</u>

The laws governing the approval and clearance of drugs and medical devices in this country are designed to protect the public from unsafe and ineffective products.  Declining to sentence Fabian – who was at the top of Acclarent's sales organization, who was personally involved in the training of new hires to position the Stratus, and who personally directed those beneath him to sell the Stratus for a use for which it had not been cleared (and praised them for doing so) – to at term of incarceration would send the wrong message.  *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (expressing concern that minimal sentence would send message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.").

D.     <u>Need to Afford Adequate Deterrence</u>

Deterring others from violating the laws that protect the public and the credibility of the FDA is of the utmost importance.  Fabian's decision not to play by the rules and his direction to those beneath him to do the same makes general deterrence of paramount importance.  General deterrence through serious sentences for corporate executives who abuse of their positions is an essential means of providing consumer protection in the critical area of medical devices and drugs.  Meaningful sentences are necessary to deter such conduct.  Absent such deterrence, others with the means and opportunity to enrich themselves at the risk of medical consumers, as well as the healthcare payment system, will similarly and cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished.  The sentence in this case should send a message that a term of imprisonment is a reality for those who choose to ignore the rules.  Most importantly, the sentence also should assure law-abiding market-participants that they are not foolish for playing by the rules and obtaining the necessary approvals and clearances before distributing their products.

E.     <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct</u>

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system where white-collar offenders were not being adequately punished.  *See* S. Rep. No. 98-225, at 77 (1983); *see also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).  The need to avoid disparities in sentencing and the gulf between white collar sentences and non-white collar sentences calls strongly for a sentence of incarceration here, where a top executive of a health care company chose to skirt the rules.

18

A sentence of incarceration for a misdemeanor conviction is consistent with sentences in other cases, including many with far less evidence of personal and direct knowledge and involvement by the corporate official.   For example, in 2011, four corporate executives received jail sentences ranging from five to nine months for FDCA misdemeanors for distribution of adulterated and misbranded devices, notwithstanding the executives' assertions that they lacked knowledge of relevant wrongdoing. [25]   The Court rejected the defendants' arguments in that case that they should not be sent to jail because they did not know that their conduct was illegal. *United States v. Higgins*, 2011 WL 6088576, at *1 (E.D. Pa. 2011).  Similarly, in October 2020, the former chief executive officer of Indivior was sentenced to six months' imprisonment for Indivior's marketing of an opioid-based product without any direct involvement in the illegal acts.  *See United States v. Thaxter*, 20-CR-00024, Dkt. 55 (W.D.V.A. Oct. 22, 2020); *see also, e.g., United States v. Quality Egg*, LLC, 99 F. Supp. 3d 920, 942-946 (imposing three-month prison sentences based upon responsible corporate officer liability for distribution of adulterated eggs adulterated without evidence of defendants' knowledge of the contaminated eggs), *aff'd. United States v. DeCoster*, 828 F.3d 626, 631 (8th Cir. 2016).[26]

---

[25] *United States v. Bohner*, No. 2:09-cr-403 (E.D. Pa. Dec. 13, 2011) (eight-months); *United States v. Higgins*, No. 2:09-cr-403, 2011 WL 6088576, at *13-14 (E.D. Pa. Dec. 7, 2011) (nine months); *United States v. Huggins*, No. 2:09-cr-403 (E.D. Pa. Nov. 21, 2011) (nine months); *United States v. Walsh*, No. 2:09-cr-403 (E.D. Pa. Nov. 22, 2011) (five months).

[26] *See, e.g., United States v. Haga*, 821 F.2d 1036 (5th Cir. 1987) (ninety-day sentence for misdemeanor distribution of misbranded drugs); *United States v. Cohen*, FDA Notices of Judgment--Food ("F.N.J.") No. 26,766 (D.N.J. 1959) (three-month sentence, upon revocation of suspended sentence, for shipping adulterated eggs); *United States v. Hohensee*, 243 F.2d 367 (3d Cir. 1957) (year-and-a-day sentence for strict-liability felony distribution of misbranded drugs; *V.E. Irons, Inc. v. United States*, 244 F.2d 34 (1st Cir. 1957) (one-year sentence for distributing misbranded food and drugs); *United States v. Kaadt*, 171 F.2d 600 (7th Cir. 1948) (one-year sentences against responsible corporate officers for distributing misbranded drugs); *United States v. Catania Importing Co.*, F.N.J. No. 7876 (D. Mass. 1945) (three-month sentence against treasurer/manager of corporation for adulteration and misbranding of oil); *United States v. Robinson*, F.N.J. No. 9695 (N.D. Ohio 1946) (six-month sentence for adulteration and

## CONCLUSION

Fabian knew that the Stratus was only cleared to be used as a spacer with saline, and he knew that it was not designed for that use and did not have a benefit when put to that use. Nevertheless, he used his position at the Vice President of Acclarent's robust sales force to help position the Stratus – through internal training and his own personal direction and encouragement of others – as a drug delivery device.  Along the way, he ignored the rules and put those sales representatives working under him in an untenable position.  He deserves the meaningful and reasonable prison sentence recommended here.

                                 Respectfully submitted,

                                 ANDREW E. LELLING
                                 United States Attorney

By:   */s/  Patrick M. Callahan*         
              SARA MIRON BLOOM
              PATRICK M. CALLACHAN
              Assistant United States Attorneys
              John Joseph Moakley United States Courthouse
              1 Courthouse Way, Suite 9200
              Boston, MA 02210
              (617) 748-3100
              RAQUEL TOLEDO
              Trial Attorney
              U.S. Department of Justice

Dated: January 6, 2021

---

misbranding of cocoa); *United States v. New Essential Cheese Cake Co.*, F.N.J. No. 4919 (E.D.N.Y. 1943) (three-month sentences against corporate officers for shipment of adulterated cheesecake); *United States v. Maltese*, F.N.J. No. 4480 (E.D.N.Y. 1942) (three-month sentence for adulteration and misbranding of oil). FDA Notices of Judgment are available at https://ceb.nlm.nih.gov/fdanj/.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Patrick M. Callahan
Patrick M. Callahan
Assistant United States Attorney

Date: January 6, 2021